**FILED**

SEP 1 1 2024

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

In The United States Dist. Court
Northern Dist. Of Oklahoma

Anthony Aaron Scott,
      Plaintiff            )

    -vs-                         No: _____ **2 4 CV - 4 2 6 CVE - CDL**

State of Texas, Dallas County, Danielle
Uher et al, , unknown others, and
Thomas D'Amore, et al          )

Civil Action For Violations of Constitution,
Statutes, Civil Rights of Mentally Incompetent
Disabled Person, Americans With Disabilities
Act and For Damages, Past, Present & Future

This is a multi-dist. Jurisdictional matter, a continuing wrong carried out in THIS Judicial Dist. And on going daily injuries.

Fact one, without probable cause defendants, all officers of the Court, in or about 11/30/2009 caused severe MENTAL and physical harm and permanent damages to plaintiff, on going today, as set forth herein, PTSD is one, Schizophrenic disorder, bipolar disorder. (See attached).

These were caused by treatment or non-treatment during 11 months of solitary confinement by defendants or their unknown agents, when plaintiff was Court ordered released, and defendants refused to release him from solitary confinement or prison.

Fact two: Records of defendants show many factors causing damages that continue to get worse causing continuing suffering and damages to plaintiff as outlined in part in the attached.

Defendants can be served legal documents at"

        203 Rd. Judicial Dist. , Dallas, Texas
        133 N Riverfront Blvd. # 28
        Dallas, Texas   75207

And    Thomas D'Amore at 1700 Pacific Ave.,
        #3750 , Dallas, Texas 75201

All defendants can be served with legal papers at these addresses.

___ Mail   ___ No Cert Svc   ___ No Orig Sign

___ C/J   ___ C/MJ   ___ C/Ret'd   ___ No Env

___ No Cpys   ___ No Env/Cpys   ___ O/J   ___ O/MJ

Plaintiff can be served at: *Anthony Scott*
*15625 S. 241st E. Avenue*
*Coweta, OK 74429*

*AS*

Attached are marked documents showing were SOME of the 'acts' against plaintiff caused damages effecting him for life. Many were supplied plaintiff by Okla. Dept. of Corr. Employees, and a few years back Pelican Bay, Cal. Federal Courts ruled NO prisoner could be confined in solitaire confinement more than 90 days and MUST be allowed outside cell for exercise , sunlight and etc., none were allowed petitioner for 11 months, THAT THE COURTS HAD RULED petitioner was NOT supposed to be in their custody.

Being mentally disabled he was discriminated against , his rights denied him, damages done to him, mentally and physically that are still going on today, AS indicated by the attached.

Plaintiff wants to seek a JURY trial, And Five (5) million dollars in damages, corrective medical cost, lost wadges , and other 'things' as developed through out this litigation.

Plaintiff believes a jury can decide amount of damages, for each wrong done him, better than he can due to his mental disabilities . Settlement is possible.

An officer of the Court was never explained to plaintiff AS he did not want a brother BAR member to represent him before other brother bar members WHERE he would have to operate IN the invading occupational army's Court, dictated to by the Judge and State prosecutor, NO ONE on plaintiffs side but pretending to be, while selling him out .

Art.1 Sec.8, clause 17 of the U.S. Const. LIMITS powers to treaty LIMITING charters to States , religion services were denied plaintiff by defendants and their agents, WHO refused to have a Grand Jury indict him or allow him to waive (See Ferguson), and the Religious Freedom Restoration Act/ Religious land Use and institutionalized Persons Act were violated by defendants in this case.

2

State has waived its Sovereign Immunity rights in this case AND held plaintiff in prison in the unconstitutional conditions for the 11 months AFTER he was Court ordered to be released, and ADA 504 is only one of several violated by defendants, and the attached exhibits proves it.

Plaintiff seeks Five (5) Million Dollars in actual damages, future harm/damages and preventive harm from defendants UNLESS settled out of Court, and moves a jury decide the details, not a Judge or a Magistrate .

It has been impossible to get a BAR member to assist plaintiff in this case, as each one owes his lively hood , license and political contacts to HIS boss , the Judge of the Court, making him a tool of the prosecution team.

Enclosed is the 'payment' to enter this case in this private Court records for litigation.

Dated: 9/9/24

Respectfully,

Anthony Scott

_____

_____

_____

AS

Certification of Mailing

A copy was mailed each KNOWN defendant in this case, this date, and NOTICE of amending or supplementing this document is intended.

Anthony Scott

Verification

The above IS as correct and detailed as possible at this time, and true.

Anthony Scott







August 14, 2024

Re: Anthony Scott

To Whom It May Concern,

My name is Brittany Winters, and I am a case manager with Family & Children's Services. I am writing this letter to document Anthony Scott's engagement in our agency. After obtaining consent to release this information, I have provided the requested information below:

**Service History:** Mr. Scott presented to our agency on August 14th and completed our treatment plan process. Mr. Scott met with a psychiatry provider for a mental health evaluation to discuss medication management. Mr. Scott will be assigned to a treatment team who will continue to engage him in services offered at our agency.

**Services receiving:** Initial Evaluation/ Treatment Plan /Medical Evaluation/ Medication Review/ Pharmacological Management/ Case Management/

**Mental Health Diagnoses:** Schizoaffective disorder, bipolar type F25.0 and Posttraumatic stress disorder F43.10

**Current Prescribed Medications:** Zyprexa with titration up to 10 mg qhs

If you have any questions, please do not hesitate to contact me at (918) 712-4301 and my office hours are Monday through Friday from 8:00 – 5:00. Thank you for your time and consideration.

Sincerely,

Brittany Winters, BS, BHCMII
Adult Psychiatry Team
Family & Children's Services
2325 S. Harvard
Tulsa, OK 74114
Phone: 918-712-4301

Kaytie Fratzke, PA-C
Adult Psychiatry Team
Family & Children's Services

CL#324493

Sarah and John Graves Center
2325 South Harvard Avenue
Tulsa, Oklahoma 74114

918.587.9471
info@fcsok.org
www.fcsok.org



Exhibit B

## PROPOSITION FIVE

On November 27, 2018, the U.S. supreme Court in, Carpenter v. Murphy #17-1107 held: "State Authority [REQUIRES] a Grand Jury Indictment and an opportunity to waive that Right", then motion to transfer to State Court. The Justices' confirmed, "No Oklahoma State Court has had jurisdiction to try [ANY PERSON] for [ANY CRIME] committed within the 70,000 sq. miles of Oklahoma [UNLESS] that case is first transferred to a State Court from a Federal Court, because "Indians are the State" and [ALL] crimes in Oklahoma are either committed by Indians, or on Indian Trust Lands, or an Indian Community / Indian Territory, inside an Indian Reservation and thereby barring jurisdiction from State Courts. See: U.S. v. Sands, 958 F. 2d. 277; Cotner v. U.S. (CIV-18-2012), citing the Act of Congress (30 STAT L. 83) 6, 7, 1887; Also on 11-27-2018, the U.S. Supreme Court confirmed: "all federal questions, proving and establishing Federal Courts had exclusive jurisdiction". Then in May 2018 in U.S. v. Bullcomings (W.D. Okla. 2018), the Court found [ALL] of Oklahoma is Indian Country, 'regardless' whether it was committed on an Indian Reservation or not, therefore [PROHIBITING] State Court Jurisdiction over any crime committed in Oklahoma, establishing Federal Courts have "exclusive jurisdiction". The Act of Congress (30 STAT. L. 83), 6, 7, 1897 "specifically mandated", "All crimes, by any race, committed in Indian Country must be prosecuted by and in Federal Court, under Federal and Arkansas laws, thus mandating Grand Jury Indictments. See: 42 W.C. 1981, Act of Congress; Cotner v. U.S. CIV-2018-2012 (Fort Smith Arkansas 2018 Order); citing: Martin v. U.s>, CIV. 2018-2018. SAME!!!

Petitioner / Defendant had a Federal Right to be prosecuted by a Grand Jury Indictment and to obtain a [MANDATORY] Waiver of that right before the State Court could proceed on an Information.

The doctrines of Res Judicata / Claim Proclusion as well as Collateral Estoppell mandates a defendant must first be advised of his Federal Right, not just Miranda, but the Right to be prosecuted [ONLY] by a Grand Jury Indictment and be given the [OPPORTUNITY] to "waive" that Right [BEFORE] the State Court can [GAIN] Jurisdiction, in order to proceed on an Information. citing: 42 U.S.C. § 1981, 'Act of Congress' mandating this. see: Harper v. Oklahoma, County Dist. Court, 484 P. 2d. 895; Flintv. Sater, 374 P. 2d. 929; and quoting: U.S. v. Ferguson, 106 S. Ct. 124; U.S. Const. Amend. 5, 6, 14; U.S. Const. Art. 6. Clause 2 @ 4 mandating States comply with and enforce Ferguson, id. @ 124.

Therefore, the Information [PROPOSITION 5] failed to invoke the main "subject matter" [JURISDICTION]. The District Court was [DEPRIVED] of Authority to [IMPOSE] a valid judgement in Petitioner's case. See: Buis v. State, 792 P. 2d. 427; quoting: Ex Porte, Custer, 200 P. 2d. 781 @ 3 Ex Porte, Kirk 275 P. 2d. 1104 @ (1), holding: the essntial elements of and or for rendering a valid judgement in a criminal case is Jurisdiction of Person, of Subject Matter, the Authority under Law to impose a [VALID] Judgement (emphasis added).

# The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment

## Abstract

This paper examines the unique set of psychological changes that many prisoners are forced to undergo in order to survive the prison experience. It argues that, as a result of several trends in American corrections, the personal challenges posed and psychological harms inflicted in the course of incarceration have grown over the last several decades in the United States. The trends include increasingly harsh policies and conditions of confinement as well as the much discussed de-emphasis on rehabilitation as a goal of incarceration. As a result, the ordinary adaptive process of institutionalization or "prisonization" has become extraordinarily prolonged and intense. Among other things, these recent changes in prison life mean that prisoners in general (and some prisoners in particular) face more difficult and problematic transitions as they return to the freeworld. A range of structural and programmatic changes are required to address these issues. Among other things, social and psychological programs and resources must be made available in the immediate, short, and long-term. That is, modified prison conditions and practices as well as new programs are needed as preparation for release, during transitional periods of parole or initial reintegration, and as long-term services to insure continued successful adjustment.

This paper addresses the psychological impact of incarceration and its implications for post-prison freeworld adjustment. Nearly a half-century ago Gresham Sykes wrote that "life in the maximum security prison is depriving or frustrating in the extreme,"[1] and little has changed to alter that view. Indeed, as I will suggest below, the observation applies with perhaps more force now than when Sykes first made it.

Moreover, prolonged adaptation to the deprivations and frustrations of life inside prison—what are commonly referred to as the "pains of imprisonment"—carries a certain psychological cost. In this brief paper I will explore some of those costs, examine their implications for post-prison adjustment in the world beyond prison, and suggest some programmatic and policy-oriented approaches to minimizing their potential to undermine or disrupt the transition from prison to home.

One important caveat is important to make at the very outset of this paper. Although I approach this topic as a psychologist, and much of my discussion is organized around the themes of psychological changes and adaptations, I do *not* mean to suggest or imply that I believe criminal behavior can or should be equated with mental illness, that persons who suffer the acute pains of imprisonment necessarily manifest psychological disorders or other forms of personal pathology, that psychotherapy should be the exclusive or even primary tool of prison rehabilitation, or that therapeutic interventions are the most important or effective ways to optimize the transition from prison to home. I am well aware of the excesses that have been committed in the name of correctional psychology in the past, and it is not my intention to contribute in any way to having them repeated.

The paper will be organized around several basic propositions—that prisons have become more difficult places in which to adjust and survive over the last several decades; that especially in light of these changes, adaptation to modern prison life exacts certain psychological costs of most incarcerated persons; that some groups of people are somewhat more vulnerable to the pains of imprisonment than others; that the psy-

Craig Haney, University of California-Santa Cruz

Exhibit
C

Exhibit 6

## INMATE RIGHTS UNDER THE ADA: A BRIEF OVERVIEW
### Prepared by the Disability Rights Network of Pennsylvania

This brochure is designed to provide general answers to a few commonly-asked

questions about the Americans with Disabilities Act (ADA).

FOR Oklahoma State Prisoners under 42 U.S.C.)( 1981 MANDATES.

Q:    Does the ADA apply to prisons?

Yes.  Title II of the ADA, 42 U.S.C. §§ 12131-12134, applies to all state prisons and

local jails.

Q:    Who is protected by the ADA?

"Qualified individuals with disabilities" are protected by the ADA.  An individual with a

disability is a person who meets one of the following three standards:

(1)    The person has a mental or physical impairment that substantially limits one or

more major life activities (such as walking, seeing, learning, hearing, interacting with

others).

Examples:  cerebral palsy; profound mental retardation; severe and persistent mental

illness; HIV infection or AIDS.

(2)    The person has a record of a mental or physical impairment that substantially

limits a major life activity.

Example:  history of heart disease

*OKLA DEPT OF CORR. PROVIDED THIS IN 2022*

16

UNCATEGORIZED   May 7, 2017

# The Long-Term Effects of Incarceration on Inmates



KATHARINE MOUND (HTTPS://WWW.ENTITYMAG.COM/AUTHOR/KMOUND/)

Long-term imprisonment–an alternative, seemingly more humane sentence for prisoners who have committed horrific crimes, may not be that much more compassionate than the death penalty. Turns out that keeping prisoners incarcerated for long-term sentences can have truly damaging effects on inmates, especially psychologically. According to "The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," the term "institutionalization" refers (https://aspe.hhs.gov/basic-report/psychological-impact-incarceration-implications-post-prison-adjustment) to the "process by which inmates are shaped and transformed by the institutional environments in which they live...it is the shorthand expression for the negative psychological effects of imprisonment."

Whereas short-term prisoners are less susceptible to "the negative psychological effects of imprisonment," inmates with longer sentences are faced with an increased chance of suffering detrimental psychological consequences from the atmosphere they are placed in for an extensive period of time. What's troubling is that former inmates must re-enter their communities taking along with them these psychological effects, which could severely impede them from successfully entering the workforce and social atmosphere. Just some of the struggles and effects of long-term imprisonment are listed below, but the list goes on.

## Regaining Autonomy and Self-Reliance

Institutionalization arises merely from existing within a prison environment, one in which there are structured days, reduced freedoms and a complete lifestyle change from what the inmate is used to. Eventually, after prisoners adjust to the structures in place, especially after long-term sentences, once they're released from captivity and their autonomy is restored,

many find it difficult to refrain from institutionalized conduct or to rely on themselves. Transitioning from a prison environment to the outside of it can cause former inmates to engage in self-destructive behavior, and potentially be reincarcerated.

(https://www.entitymag.com)

# Chronic diseases linked to sleep problems

Nearly a third of Americans are getting inadequate sleep -- including police officers, healthcare workers and truck drivers -- and it is getting worse with every passing year, says a new study from Ball State University.

"Short Sleep Duration in Working American Adults," an analysis of more than 150,000 working adults from 2010 to 2018, found that prevalence of inadequate sleep — 7 hours or less — increased from 30.9 percent of respondents in 2010 to 35.6 percent in 2018 (Journal of Community Health).

The study also found that the people who report getting the fewest hours of shut-eye include native-born Americans, who are female, have children at home, work for the government, and live in the South.

"Inadequate sleep is associated with mild to severe physical and mental health problems, injury, loss of productivity, and premature mortality," said Jagdish Khubchandani, lead author and a health science professor at Ball State.

"This is a significant finding because the U.S. is currently witnessing high rates of chronic diseases across all ages, and many of these diseases are related to sleep problems."

The study found that in 2018, professions with the highest levels of poor sleep, including those in the police and military (50 percent), health care support occupations (45 percent), transport and material moving (41 percent), and production occupations (41 percent).

"There is no definitive cause found for these trends in sleep duration in the working American population."

Khubchandani said. "We see the workplace is changing as Americans work longer hours, and there is greater access and use of technology and electronic devices, which tend to keep people up at night. Add to this the progressive escalation in workplace stress in the United States, and the rising prevalence of multiple chronic conditions could be related to short sleep duration in working American adults."

*The study also found:*

- For men, about 30.5 percent reported getting seven or fewer hours of sleep in 2010 and by 2018 about 35.5 percent reporting inadequate sleep.

- Among women, those reported too little sleep grew from 31.2 percent in 2011 to 35.8 percent in 2018.

- By race and inadequate sleep prevalence, the trend from 2010-2018 was 29.2 to 34.1 percent for whites, 40.6 to 46.5 percent for African Americans, 29.5 to 35.3 percent for Asians, and 35.2 to 45.2 percent for multiracial adults.

- From 2010 to 2018, the largest increases in sleep deprivation were reported by men, multiracial individuals, older adults, those living in the western U.S., and widowed, divorced, or separated people.

Khubchandani believes that employers should take steps to make sure their workers are getting enough rest.

"Employers have a major responsibility and should use health promotion strategies to ensure that workers who struggle with sleep problems are assisted," he said. "We all suffer when

drivers, doctors, and nurses are sleep deprived."

Khubchandani also warns that the use of over-the-counter medications may be making life miserable for millions of Americans.

"Many of these medications can have side effects, including worsening of insomnia when inappropriately prescribed or used. Even in primary care, insomnia is frequently misreported, ignored, or the treatment could be suboptimal, despite access to standard treatment interventions," he said.

Khubchandani also suggests that from a public health perspective, chronic sleep problems need management by qualified professionals.

"There is a need for increasing awareness and improving the diagnosis and treatment of sleep disorders," he said. "There needs to be an emphasis on public education, training for health professionals, and monitoring."



At the dawn of human history, some 6000 years ago, in the ancient city of Babylon, a spurt of great prosperity in agriculture brought about a population boom and the formation of family Tribes, which also spirited a frenzy of fights and battles within and between these groups in an effort to establish tribal supremacy. Out of this confusion arose an intelligent and tyrannical individual by the name of Hamurabi.

Hamurabi devised a system of mind control, population control and laws of conduct and trade, which was later defined as: The

*OK 5th Aty Gen*
*PROVIDE STATE*
*IN 20 20*

# JURY POWER

"IN SUITS AT COMMON LAW, WHERE THE VALUE IN CONTROVERSY SHALL EXCEED TWENTY DOLLARS, THE RIGHT TO TRIAL BY JURY SHALL BE PRESERVED, AND NO FACT TRIED BY A JURY, SHALL BE OTHERWISE RE-EXAMINED IN ANY COURT OF THE UNITED STATES, THAN ACCORDING TO THE RULES OF THE COMMON LAW."
VII AMENDMENT BILL OF RIGHTS

conducted, AND tax monies

Exhibit H

(Central) to justify their warring against the government at the time, to be outside their individual territories AND restricted it to a 10 mile area, a swamp, described as the United States, that is limited to a 10 square mile plot of ground, no one wanted, north of Virginia, and south east of Maryland, and it's sole jurisdiction is regulated and created through a treaty CONSTITUTIONALLY limited to passing laws that only applies to residents of the United States, (I.E., the District of Columbia only), and it's sole job is to protect the individual rights of residents in the colonies , and chartered by it, WITHOUT power to deligate any powers to individual territories becoming a state.

INDIVIDUALS retain the sovereign right to remove themselves from any treaty or any chartered agreement unless they individually ratify that law or agreement, BECAUSE they are sovereign citizens, but states do NOT have that right, and their charter prevents it. Leaving the individual powers and rights TO THE INDIVIDUAL. THAT is Common Law in a nut shell.

Read the legal defination of 'legislative jurisdiction' from Blacks Law Dictionary.
"The spere of authority of a legislative body (State or Federal)
to enact laws and to conduct all business incidental to it'd law
making function",(restricted to passing laws effecting
governmental business of protecting INDIVIDUAL Rights).

Art.1 of the U.S. Const. And Art. 1, Sec. 8, clause 17 of the Const. LIMITS the U.S. Congress, and through treaty limiting charters to states, to exclusive legislation over the Dist. Of Columbia "NOT TO EXCEED 10 square miles except in time of a congressionaly declared war, and to exersize like authority over all places PURCHASED by the consent of the legislature of the state in which the same shall be FOR THE ERECTION only of forts, magizines, arsenals, dockyards and other needful BUILDINGS."

Clearly this constitutional limitation upon places the U.S. Government can pass laws effecting conduct or acts, AND chartered states, EXEMPTS all residents of other areas from prosecution for acts committed within privately owned or jointly owned public lands, EXCEPT in Common Law Courts.

The 10th. Amend. To the U.S. Constitution, (also 9th.) part of every Charter given to each state, says the powers NOT specifically deligated to the U.S. By the Const. NORE prohibited by it to the states (The Original 13 Colonies states ARE reserved to the states INDIVUIDUAL residents and the central government IS restricted from taking powers reserved by treaty, ( A REPUBLICAN not Democratic form of Government), and chartered from and to the individual people and selected political partie wishes TI/EXCLUDE all persons NOT a member, OR who do not agree with them where they pass some law effecting the rights of non-members is null and void and prohibited by Charter , treaty and constitution AS well as under Common Law.

States charters FORBID them from using anything but gold and silver COIN as legal tender, forbids them from keeping troops in time of war, OR militerising police forces, AS IF THEY DO under Common Law and Charter they forfit statehood and revert back to territories.

Nore can new residents be forced to enter retroactively the treaty, against his/her will or give up any of their soveriqn rights, or be restricted by dead persons prior agreements to original treaty/charters, WITHOUT Due Process of Notice, and opportunity TO challenge them RATIFY them or reject them.

Lession One                     2

782                          A JAILHOUSE LAWYER'S MANUAL                          Ch. 28

may sue states for money damages under Title II, at least in situations where the alleged misconduct *actually* violates the parts of the Constitution that apply to the states.[200] (In that case, the plaintiff alleged Eighth Amendment violations;[201] however, the ruling is broad, and applies to more than just the Eighth Amendment.) The court did not say whether the Eleventh Amendment waiver also applies to ADA violations that do not involve constitutional violations.[202]

So the current rule is that prisoners may sue states for money damages under Title II when a state prison system (1) violates any of the rights that are part of the Fourteenth Amendment and (2) violates Title II.[203] (The Fourteenth Amendment includes most of the rights in the first eight amendments to the Constitution.) It appears that, after *Lane* and *Georgia*, lower courts will take a case-by-case approach, considering the particular circumstances, in determining whether the plaintiff can sue the state for money damages.[204] And, of course, some courts will be more likely than others to permit money damages.[205]

If you are considering bringing a disability discrimination claim under Title II, you should look at how the decisions in *Lane* and *Georgia* have been analyzed and interpreted by other courts, disability rights organizations, and academics. See Chapter 2 of the *JLM* for information on performing legal research.

### (ii)   Sovereign Immunity and Section 504

Courts are divided over whether states are protected by sovereign immunity under Section 504. Most Courts of Appeals that have addressed this issue have held that you *can* seek monetary damages under Section 504.[206] But the Second Circuit has held that you *might* not be able to get monetary damages from

---

acted with "discriminatory animus or ill will" toward the disabled. Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 111 (2d Cir. 2001). The Sixth Circuit has allowed money damages against the state under Title II only if the discrimination amounted to a violation of an individual's due process rights under the 14th Amendment. Lane v. Tennessee, 315 F.3d 680, 682 (6th Cir. 2003) (holding that "it was reasonable for Congress to conclude that it needed to enact [the ADA] to prevent states from unduly burdening" rights protected by the 14th Amendment), aff'd, 541 U.S. 509, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004). Only the Ninth Circuit has held that individuals may sue the state for money damages under Title II. Hason v. Med. Bd. of Cal., 279 F.3d 1167, 1171 (9th Cir. 2002) (holding that Congress validly abrogated states' 11th Amendment immunity when enacting Title II).

200.   United States v. Georgia, 546 U.S. 151, 159, 126 S. Ct. 877, 882, 163 L. Ed. 2d 650, 660 (2006).

201.   United States v. Georgia, 546 U.S. 151, 160–61, 126 S. Ct. 877, 883, 163 L. Ed. 2d 650, 661 (2006) (Stevens, J., concurring).

202.   United States v. Georgia, 546 U.S. 151, 159, 126 S. Ct. 877, 882, 163 L. Ed. 2d 650, 660 (2006); Miller v. King, 384 F.3d 1248, 1263–67 (11th Cir. 2004), *vacated and superseded on other grounds*, 449 F.3d 1149 (11th Cir. 2006).

203.   United States v. Georgia, 546 U.S. 151, 159, 126 S. Ct. 877, 882, 163 L. Ed. 2d 650, 660 (2006).

204.   *See* United States v. Georgia, 546 U.S. 151, 159, 126 S. Ct. 877, 882, 163 L. Ed. 2d 650, 660 (2006). In *United States v. Georgia*, the Supreme Court held that lower courts were in the best position to determine (1) which aspects of the State's alleged conduct violated Title II of the ADA, and (2) to what extent such conduct also violated the 14th Amendment. Additionally, the Supreme Court held that when lower courts find that the State's conduct violated Title II but did not violate the 14th Amendment, lower courts should determine whether Congress intended that people should still have a right to sue the states for money damages.

Since *United States v. Georgia*, a number of courts have allowed prisoners to sue for monetary damages when they establish both that (1) the state prison system violated Title II of the ADA, and (2) the actions of the state prison system violated prisoners' 14th Amendment rights. Degrafinreid v. Ricks, 417 F. Supp. 2d 403, 409 (S.D.N.Y. 2006) (ruling that a prisoner could bring a claim for money damages against his prison system for confiscating and destroying his hearing aid; the prison's actions might have violated the prisoner's 8th Amendment right to be free from cruel and unusual punishment). However, when a State's actions violate Title II but not the Constitution, courts have been hesitant to allow the prisoner to sue for monetary damages. *See, e.g.*, Miller v. King, 384 F.3d 1248, 1264–65 (11th Cir. 2004), *vacated and superseded on other grounds*, 449 F.3d 1149 (11th Cir. 2006) (holding that Title II damages suits may only be brought where a "fundamental right" is affected, and so the prisoner could not bring a Title II damages suit against state); Flakes v. Franks, 322 F. Supp. 2d 981, 983 (W.D. Wisc. 2004) (noting that it was not clear whether the prisoner's Title II claim for money damages would be proper).

205.   *See, e.g.*, Phiffer v. Columbia River Corr. Inst., 384 F.3d 791, 792–93 (9th Cir. 2004) (upholding a prior decision permitting a prisoner to bring a Title II claim for damages against the state); *see also* Carasquillo v. City of New York, 324 F. Supp. 2d 428, 442 (S.D.N.Y. 2004) (noting that *Lane* permits Title II claims for money damages against state and local governments, but dismissing the claim on other grounds).

206.   *See* Garrett v. Univ. of Ala., 344 F.3d 1288, 1293 (11th Cir. 2003) (explaining that states waive their 11th Amendment immunity to § 504 suits when they receive federal funds); A.W. v. Jersey City Pub. Sch., 341 F.3d 234, 238 (3d Cir. 2003) (stating that Congress clearly required states to waive their immunity if states accepted federal funding); Doe v. Nebraska, 345 F.3d 593, 604 (8th Cir. 2003) (holding that the state clearly waived its immunity in accepting federal funds); Miranda B. v. Kitzhaber, 328 F.3d 1181, 1186 (9th Cir. 2003) (stating that "it is clear that a state waives its immunity from suit under the Rehabilitation Act by accepting federal funds"); Carten v. Kent State Univ., 282 F.3d

*Exhibit J*

It should be apparent even to the lawyers that the plain language of the statutes make contracts of both voluntary and involuntary peonage null and void and punishable by up to ten years in prison.

The Supreme Court discusses the issue of slavery and peonage quite succinctly in the case of *Alonzo Bailey v. State of Alabama*, 219 U.S. 219, (1911). Suffice it to say that the court held that contracts of peonage may be breached by either party at any time with impunity because contracts for peonage are unconstitutional. This is a landmark and very important case and the authors recommend that the readers obtain and study it. It is available at the website: http://www.findlaw.com/http://caselaw.lp.findlaw.com/scripts/getcase.pl?navby=case&court=us&vol=219&page=219

All forms of slavery including debt bondage and peonage are prohibited by a number of treaties forbidding slavery to which the United States is a high contracting party. The mention of only two of these treaties of which the United States is a party will be suffice to make the point. The full text of all the anti-slavery treaties may be found at the website: http://tufts.edu/departments/fletcher/multi/humanRights.html

### AMERICAN CONVENTION ON HUMAN RIGHTS
### "PACT OF SAN JOSE COSTA RICA"

(22 Nov. 1969) – Entered into force on 18 July, 1978.
Article 6. FREEDOM FROM SLAVERY. 1. No one shall be subject to slavery or to involuntary servitude, which are prohibited in all their forms, as is the slave trade and traffic in women.

### UNIVERSAL DECLARATION OF HUMAN RIGHTS

(Adopted by UN General Assembly Resolution 217A (III) of 10 December 1948)
Article 4. No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms.

The language of the treaties should be clear even to the most incompetent of lawyers, that slavery, in all of its insidious forms, violates the well established, universally recognized norms of universal law and the international consensus of nations. Your authors now submit that **the governments of the UNITED STATES and the various STATES are rogue states that violate their own laws and the laws of nations and are managed by pirates.** These rogue states ignore their own laws and the international laws of nations by making their own people slaves.

The most egregious thing that our tyrannical government does is the enforcement of the death penalty in maritime causes. The authors have no objection to the execution of a man clearly guilty of a heinous axe murder, rightfully and

*Exhibit 15*

According to Black's 6th, "interest" denotes a right, claim, title, or legal share in something; it means a right to have the advantage accruing from anything; any right in the nature of property, but less than title. There you have it folks, the STATE looks at your children as property, and claims the priority right or legal share in them. Was Shakespeare right about what to do with the lawyers?

## SLAVERY AND DEBT BONDAGE

If the STATE claims some right, or interest in the people, it means that the STATE is treating the people as property, and when people are treated as property they are slaves. Debt bondage or peonage is a form of slavery and slavery is against the law. Slavery violates the 13th Amendment. Slavery violates federal law at Title 18 U.S.C., Section 1581 and Title 42 U.S.C. 1994.

### TITLE 18 - CRIMES AND CRIMINAL PROCEDURE PART I - CRIMES CHAPTER 77 - PEONAGE AND SLAVERY

Sec. 1581. Peonage; obstructing enforcement
(a) Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 10 years, or both. (b) Whoever obstructs, or attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be liable to the penalties prescribed in subsection (a). SOURCE (June 25, 1948, ch. 645, 62 Stat. 772; Pub. L. 103-322, title XXXIII, Sec. 330016(1)(K), Sept. 13, 1994, 108 Stat. 2147; Pub. L. 104-208, div. C, title II, Sec. 218(a), Sept. 30, 1996, 110 Stat. 3009-573.)

### TITLE 42 - THE PUBLIC HEALTH AND WELFARE CHAPTER 21 - CIVIL RIGHTS SUB-CHAPTER I - GENERALLY

Sec. 1994. Peonage abolished

The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in any Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of any Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, **the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void.**
-SOURCE- (R.S. Sec. 1990.)

Case 4:24-cv-00426-CVE-CDL    Document 1    Filed in USDC ND/OK on 09/11/24    Page 15 of 15

FROM:

Anthony Scott
15633 S. 241St E. Avenue
Coweta, OK 74429

Retail




UNITED STATES
POSTAL SERVICE

RDC 99

74103

U.S. POSTAGE PAID
FCM LG ENV
TULSA, OK 74135
SEP 09, 2024

$2.31

S2324M502276-11

TO:

Northern District Court for
State of Oklahoma
324 S. Boulder Avenue
Tulsa, OK 74103

RECEIVED

SEP 11 2024

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

24 CV - 426 CVE - CDL

**Utility Mailer**
10 1/2" x 16"

Ready**P**ost